UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

_____

KEITH CROW,                                    Civil No. 08-3350 (PJS/FLN)

                    Plaintiff,

        v.                                     **REPORT AND RECOMMENDATION**

JOAN FABIAN, DAVID R. CRIST,
JERRY CLAY, LCIE STEVENSON,
and LYNN MILLING,
                    Defendants.

_____

        Plaintiff is a prisoner of the State of Minnesota who is currently incarcerated at a

prison in Connecticut.  He commenced this action by filing a complaint seeking relief under

42 U.S.C. § 1983, claiming that the above-named Defendants have violated his federal

constitutional rights.  Four of the named Defendants – Joan Fabian, David R. Crist, Jerry

Clay and Lcie Stevenson – have filed a motion for summary judgment.[1]  Plaintiff has

opposed Defendants' summary judgment motion, and filed his own motion for summary

judgment.[2]

        The parties have filed numerous affidavits, exhibits and memoranda in support of

their respective positions, and the matter has been referred to this Court for a report and

recommendation under 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed

_____

        [1]  The fifth named Defendant, Lynn Milling, has filed an answer, (Docket No. 61), but
has not joined in the present motion for summary judgment.

        [2]  The Clerk's Office did not file Plaintiff's motion for summary judgment as a
separate document, but instead filed it as part of Plaintiff's response to Defendants'
summary judgment motion.  (Docket No. 66-1, pp. 97-103.)  Despite that misfiling, the
moving Defendants have acknowledged Plaintiff's summary judgment motion, and
responded to it.  (Docket No. 80.)

below, it will be recommended that Defendants' motion for summary judgment be granted, that Plaintiff's motion for summary judgment be denied, and that this action be dismissed, as to all Defendants, with prejudice.

## I. FACTUAL BACKGROUND

In August 2005, a Minnesota state court jury found Plaintiff guilty of aiding and abetting first degree murder. Plaintiff was later sentenced to life in prison. Plaintiff's conviction and sentence were upheld by the Minnesota Supreme Court on direct appeal. State v. Crow, 730 N.W.2d 272 (Minn. 2007).

On November 2, 2005, Plaintiff entered the Minnesota Correctional Facility in St. Cloud, Minnesota, ("MCF-SCL"), to begin serving his life sentence. Four days later, Plaintiff got into a fist fight with another inmate. (Affidavit of Barb Stoltz, ["Stoltz Aff."], [Docket No. 37], Exh. B.) He pled guilty to "disorderly conduct," and was assigned to segregated confinement for fifteen days. (Id., Exh. C.)

While Plaintiff was still in segregated confinement, prison officials at MCF-SCL intercepted a message that Plaintiff attempted to deliver to a fellow inmate. The message indicated that another inmate should be "taken care of," which prison officials interpreted to be a threat. (Id., Exh. D.) Plaintiff was then found guilty of "threatening others," and "disorderly conduct," and he was assigned to segregated confinement for another 45 days. (Id., Exh. E.)

After 60 consecutive days of segregated confinement, (which began four days after his arrival at MCF-SCL), Plaintiff was released into the general prison population on January 2, 2006. Later that same day, Plaintiff got into another fight. (Id., Exh. F.) He again pled guilty to disorderly conduct, and he was assigned to another fifteen days in

segregated confinement.  (Id., Exh. G.)

While Plaintiff was in segregated confinement, prison officials conducted an investigation, and concluded that Plaintiff, a Native American, was actively involved in Native American gang activities and gang rivalries.  He was deemed to be a significant danger to himself and others.   Therefore, the administration at MCF-SCL requested that Plaintiff be transferred to a prison in another state pursuant to an "Interstate Corrections Compact."  (Id., Exh. J.)  The "Interstate Corrections Compact Transfer Request," (id.), indicates that –

> "The administration of MCF-St. Cloud is requesting and [sic] Interstate Compact transfer for offender Crow, #205852 because he is unable to make a satisfactory adjustment into the general population in any Minnesota Correctional Facility.
>
> Since admission offender Crow has been involved in a struggle for control with the Native Chief and they are rival gang members.  The rival gang, because of ongoing control issues, recently assaulted Crow.  He is serving a life sentence without the possibility of parole and has stated that he has nothing to lose 'I'll ride or die til I'm gone.'  His behavior has become increasingly threatening and hostile."

After Plaintiff reached the end of his third stint of segregated confinement at MCF-SCL, he remained in segregated confinement, because prison administrators determined he was "in danger from other offenders and administrative status is warranted to allow time to investigate this information."  (Id., Exh. K.)  Prison officials then determined that he should be transferred to a different Minnesota prison facility, pending his ultimate transfer to an out-of-state prison.  (Id.)  On or about February 14, 2006, Plaintiff was transferred to the Minnesota Correctional Facility at Oak Park Heights, Minnesota, ("MCF-OPH").  (Id.)

When Plaintiff arrived at MCF-OPH, a prison Program Coordinator, Defendant Lcie Stevenson, assigned him to "administrative segregation."  Stevenson assigned Plaintiff to

administrative assignment pursuant to Minnesota Department of Corrections, (DOC), Policy # 301.085. (Affidavit of Lcie Stevenson, ["Stevenson Aff."], [Docket No. 39], p. 1, ¶ 2.) Policy # 301.085 provides that a prisoner will be placed into administrative segregation if he is being held pending a transfer to another facility. (Stoltz Aff., Exh. L.) Because Plaintiff was awaiting a transfer to an out-of-state facility, Stevenson assigned him to administrative segregation pursuant to Policy # 301.085. (Stoltz Aff., p. 3, ¶ 13.)

Interstate prison transfers often take many months to complete, so prisoners awaiting such transfers often spend substantial periods of time in administrative segregation. (Stoltz Aff., p. 4, ¶ 14.) In Plaintiff's case, it took just over twelve months to complete his prison transfer, and he remained in administrative segregation during that time.

While Plaintiff was in administrative segregation at MCF-OPH, he was afforded more privileges than he would have received if he had been in segregated confinement for punitive reasons. (Stoltz Aff., Exh. N.) Prisoners in administrative segregation have a private television and shower, and they are allowed three hours per week of visitation, seven hours per week of exercise, four fifteen-minute phone calls per week, a radio, and the opportunity to spend $25.00 per week in the prison canteen. (Stoltz Aff., pp. 4-5, ¶ 15; Exh. N.) Plaintiff's administrative review status was reviewed by Defendant Stevenson, or some other prison official, approximately once a month. (Stevenson Aff. P. 2, ¶s 3-4.) However, Plaintiff remained on administrative status during the entire year that he was at MCF-OPH, pursuant to Policy # 301.085, because he was awaiting a transfer to another prison during all of that time.

Plaintiff was transferred to a prison in Connecticut on February 19, 2007.[3]  He contends that Defendants Joan Fabian, David R. Crist and Jerry Clay were ultimately responsible for effecting his transfer.  Defendant Fabian is identified as the Commissioner of the Minnesota DOC; Defendant Crist is identified as the Assistant Commissioner of the Minnesota DOC; and Defendant Clay is identified as the Deputy Compact Administrator of the Minnesota DOC.  (Complaint, [Docket No. 1], Attachment B.)

On April 19, 2007, which was approximately two months after Plaintiff arrived at the prison in Connecticut, the Minnesota Supreme Court affirmed his conviction and sentence on direct appeal.  On April 11, 2008, Plaintiff filed a federal habeas corpus petition in this District Court, challenging the validity of his state murder conviction on several grounds.  (Crow v. Hatch, Civil No. 08-1039 (PJS/FLN).)  The undersigned Magistrate Judge found that Plaintiff's habeas petition included some claims that were "unexhausted," because Plaintiff had failed to present them to the Minnesota state courts.  It was therefore recommended that Plaintiff's habeas corpus petition be dismissed without prejudice.  (Id., Report and Recommendation dated April 14, 2008; [Docket No. 4].)  The District Court Judge adopted that recommendation, and Plaintiff's habeas corpus petition was dismissed. (Id., Order dated May 30, 2008; [Docket No. 9].)  The District Judge's dismissal order explained to Plaintiff that if he wanted his "unexhausted" claims to be reviewed in a future federal habeas action, it would behoove him to bring those claims before the Minnesota state courts by means of a state post-conviction petition brought under Minn.Stat. §§

_____

[3]  Plaintiff states that he was released into the general prison population at the Connecticut prison on March 2, 2007, which was about eleven days after he arrived there. (Complaint, [Docket No. 1], Attachment C.)

5

590.01, et. seq.  (Id., pp. 3-4.)

On July 14, 2008, Plaintiff filed a "Petition for Post-conviction Relief" in the state trial court, pursuant to Minn.Stat. § 590.01.  (Affidavit of Jackson Evans, ["Evans Aff."], [Docket No. 38], Exh. C.)  That petition was denied on September 25, 2008.  (Id., Exh. D.)  On November 3, 2008, Plaintiff filed a motion for reconsideration of his post-conviction petition.  (Id.)  That motion was denied on November 21, 2008.  (Id.)  Although Plaintiff was clearly advised that he could seek appellate review of his post-conviction claims, (id., pp. 2, 3), he apparently declined to file an appeal after his motion for reconsideration was denied.  Instead, Plaintiff filed a second post-conviction petition.  The second post-conviction petition is dated December 24, 2008, (id., Exh. E, p. 3), but it apparently was not filed until January 6, 2009, (id., Exh. F, p. 2).

In Plaintiff's second post-conviction petition, he contended that he had been deprived of his constitutional right of "access to the courts" while he was pursuing post-conviction relief.  He argued, inter alia, that:

> "[H]is constitutional right to file and fairly be heard on his first post-conviction application was violated when he was not provided any form of assistance by the state in filing.  The petitioner, who is incarcerated in another state, did not have access to any state required assistance to help him establish a record for his claims, further articulate the claims or abide by any statutes or rules of practice associated with... the petition for post-conviction relief and executing an appeal....  The petitioner provides that because of his long-distance confinement without any constitutionally required state assistance with the filing, drafting and inclusion of documents in support, his constitutional right to be fairly heard and access the court was violated in pursuance of his first petition."

(Id., Exh. E, pp. 2-3.)

On March 20, 2009, the trial court judge filed an eight-page order, entitled "Finding of Fact, Conclusions of Law, Order, and Memorandum," which denied Plaintiff's second

state post-conviction petition. (Id., Exh. F.) In that order, the trial court judge carefully addressed the claims presented in Plaintiff's second post-conviction petition, including the "access to the courts" claim. The judge concluded that Plaintiff's "access to the courts" claim was unsustainable, because (a) he was able to present his post-conviction claims in a timely and proper manner, and (b) those claims were rejected because they were either procedurally barred or simply lacking in merit. The order denying Plaintiff's second post-conviction petition explicitly states that the denial of Plaintiff's claims could not be attributed to any lack of legal resources. (Id., pp. 7-8.)

Plaintiff filed his present lawsuit on June 27, 2008 – shortly after his federal habeas corpus petition was dismissed, (on May 30, 2008), and shortly before he filed his first state post-conviction petition, (on July 14, 2008). Plaintiff's complaint presents five § 1983 claims against the four moving Defendants, which can be summarized as follows:

(1) Defendant Stevenson violated Plaintiff's constitutional right to due process, by assigning him to administrative segregation at MCF-OPH, without affording him the procedural benefits of due process.

(2) Defendant Stevenson violated Plaintiff's constitutional right to equal protection by assigning him to administrative segregation at MCF-OPH.

(3) Defendants Fabian, Crist and Clay violated Plaintiff's constitutional right to due process by causing him to be transferred to an out-of-state prison, (and refusing to transfer him back to Minnesota), without affording him the procedural benefits of due process.

(4) Defendants Fabian, Crist and Clay violated Plaintiff's constitutional right to equal protection by causing him to be transferred to an out-of-state prison, (and refusing to transfer him back to Minnesota).

(5) Defendants Fabian, Crist and Clay violated Plaintiff's constitutional right of access to the courts by causing him to be transferred to an out-of-state prison, and by failing to provide him with adequate legal resources during his confinement in Connecticut.

The moving Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims against them. The Court agrees.

## II. STANDARD OF REVIEW

In considering a motion for summary judgment, the Court is to determine whether there are any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). When there is no reasonable construction of the facts that would allow the nonmoving party to prevail, the remedy of summary judgment is appropriate. Matsushita, 475 U.S. at 587-88. The role of the court is not to weigh the evidence, but to determine whether, as a matter of law, a genuine factual conflict exists. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences that can be drawn from the evidence. Id.

On a motion for summary judgment, the moving party has the initial burden of establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true. Fed. R. Civ. P. 56(c). To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. Ltd., 475 U.S. at 586; Fed. R. Civ. P. 56(e). If a motion for summary judgment is properly supported by affidavits or other evidence, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. Id. at 587; Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 585 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988). Although the evidence is examined in the light most favorable to the non-moving party, the non-moving party may not rely on conclusory allegations or denials. Anderson, 477 U.S. at 256; Lambert v. City of Dumas, 187 F.3d 931, 934-35 (8th Cir. 1999).

The moving party is entitled to summary judgment when the non-movant fails to establish the existence of an essential element of a claim on which that party has the burden of proof at trial. Celotex Corp., 477 U.S. at 322. No genuine issue of material fact exists absent such foundation because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587. The Court considers the motion for summary judgment based upon the material presented in connection with the motion. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." Id. at 251-52.

The Court is mindful that pro se pleadings should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972); White v. Bond, 720 F.2d 1002, 1003 (8th Cir. 1983). Therefore, pro se pleadings are held to less stringent standards when challenged by motions to dismiss or for summary judgment. Haines, 404 U.S. at 520; Horsey v. Asher, 741 F.2d 209, 211 n.3 (8th Cir. 1984). Nonetheless, a pro se plaintiff's claim cannot survive a motion for summary judgment unless, in some form, he can fairly be said to have set forth specific facts demonstrating that there is a genuine issue of material fact that requires a trial. Miller v. Solem, 728 F.2d 1020, 1023, (8th Cir.), cert. denied, 469 U.S. 841 (1984); Quam v. Minnehaha County Jail, 821 F.2d 522 (8th Cir. 1987).

## III. DISCUSSION

### A. Due Process Claim Against Defendant Stevenson

Plaintiff's initial claim pertains to the year that he spent in administrative segregation at MCF-OPH, while he was awaiting a transfer to a prison in another state. Plaintiff contends that Defendant Stevenson violated his constitutional rights, by causing him to be assigned to administrative segregation, without affording him due process. He believes that he should have been granted a hearing, and an opportunity to oppose his separation from the general prison population.

To maintain an actionable due process claim, a prisoner must allege, (and ultimately prove), that he has been deprived of some constitutionally protected liberty or property interest. Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) ("[a] due process claim is cognizable only if there is a recognized liberty or property interest at stake"). If a claimant cannot establish that he has been deprived of constitutionally protected interest, there is

no need to consider whether he received due process. Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("[w]e need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest").

In prisoner cases, a constitutionally protected liberty interest will be found, and the protections of due process will therefore come into play, only when the prisoner can show that he has suffered the type of unusual hardship, or dramatic departure from ordinary prison life, that was contemplated by the Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995). In Sandin, the Court held that a prisoner cannot sustain a due process claim unless he can show that he suffered an "atypical and significant hardship... in relation to the ordinary incidents of prison life." Id. at 484. Our Court of Appeals has interpreted Sandin to mean that prisoner due process rights are implicated only when there have been "deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." Moorman v. Thalacker, 83 F.3d 970, 972 (8th Cir. 1996) (emphasis added).

Prisoners are commonly removed from the general prison population for a variety of reasons, and a prisoner who is placed in segregated confinement normally does not suffer the type of "significant hardship" that implicates a constitutionally protected liberty interest. See Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002) ("[w]e have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin"). Segregated confinement does not give rise to a protected liberty interest, unless there is something particularly unusual and pernicious about the nature of such confinement. See Moorman, supra.

In this case, Plaintiff seems to believe that he was deprived of a liberty interest warranting due process protection simply because he was kept in segregated confinement for a full year. It is undoubtedly true that "[t]he length of time of a prisoner's segregation is a significant factor in the determination of whether the confinement is an 'atypical and significant hardship.'" Herron v. Wright, No. 96-2319 (8th Cir. 1997),1997 WL 292333 (unpublished opinion) at * 1. In some cases, the extreme length of a prisoners' stay in segregated confinement creates a virtual presumption of hardship. See e.g., Williams v. Norris, 277 Fed.Appx. 647, 648 (8th Cir. 2008) (unpublished opinion) ("considering the particular restrictions imposed" on a prisoner, twelve years in segregated confinement "constitute[d] an atypical and significant hardship"). See also Wilkinson, 545 U.S. at 224 (solitary confinement "impose[d] an atypical and significant hardship" because of "indefinite" duration, combined with preclusion of parole eligibility).

However, federal courts have frequently found that segregated confinement lasting nearly a full year, or even longer, does not constitute the type of hardship that gives rise to a protected liberty interest. See e.g., Hemphill v. Delo, No. 95-3357 (8th Cir. 1997), 1997 WL 581079 (unpublished opinion) at *2 (more than 300 days in segregated confinement, by itself, "does not constitute an 'atypical and significant hardship' when compared to the burdens of ordinary prison life"); Howard v. Collins, No. 97-1642 (8th Cir. 1997), 1997 WL 710314 (unpublished opinion) at * 1 (prisoner's "eight-month stint in ad seg" not shown to be "an atypical and significant hardship in relation to the ordinary incidents of prison life"); Griffin v. Vaughn, 112 F.3d 703, 708 (3rd Cir. 1997) ("we believe that exposure to the conditions of administrative custody for periods as long as 15 months 'falls within the expected parameters of the sentence imposed... by a court of law,'" and thus prisoner's

"commitment to and confinement in administrative custody did not deprive him of a liberty interest and... he was not entitled to procedural due process protection"); <u>Jones v. Baker</u>, 155 F.3d 810, 812-13 (6th Cir. 1998) (two and one-half years in administrative segregation deemed not to be an atypical and significant hardship); <u>Jordan v. Federal Bureau of Prisons</u>, 191 Fed.Appx. 639, 652-53, (10th Cir. 2006) (unpublished opinion) (upholding summary judgment that dismissed prisoner's due process claim, because five years in administrative detention was not an atypical or significant hardship in relation to the ordinary incidents of prison life), <u>cert</u>. <u>denied</u>, 550 U.S. 970 (2007).

In <u>Rahman X v. Morgan</u>, 300 F.3d 970, 973-74 (8th Cir. 2002), our Court of Appeals found that twenty-six months of segregated confinement is "substantial," but not inherently "an 'atypical and significant hardship... in relation to the ordinary incidents of prison life." There, the Court considered the conditions of a prisoner's segregated confinement, and found that he had not suffered the type of hardship that would implicate a protected liberty interest. The Court noted, in particular, that the prisoner "was allowed out of his cell for recreation for three hours per week," and that his "inability to watch television in his cell" could not deemed a "significant hardship, even when combined with the other minor deprivations" of his confinement. <u>Id</u>. at 974.

In the present case, Plaintiff is unable to show that his segregated confinement met the <u>Sandin</u> standard. The record shows that prison officials recognized that Plaintiff might remain in segregated confinement for a prolonged period, because interstate prison transfers cannot be quickly and easily accomplished, and they therefore tried to minimize the negative aspects of Plaintiff's segregation from the general prison population. Plaintiff was deliberately placed in a prison setting that was intended to minimize the onerousness

of his segregation.  See Stoltz Aff., pp. 4-5, ¶ 15 ("MCF-OPH provides inmates with more amenities and privileges than any other administrative segregation unit operated by the DOC").  Plaintiff was allowed out of his cell for seven hours per week, (id., Exh. N), compared to only three hours per week for the prisoner in Rahman X; and Plaintiff apparently was allowed to have television in his cell, (id., p. 5, ¶ 15), unlike the prisoner in Rahman X.  The record also shows that prisoners in administrative segregation at MCF-OPH normally are allowed to spend money, (up to $25.00 per week), in the prison canteen; they are allowed to have radios; they are allowed to make four fifteen-minute phone calls per week; and they are allowed a total of three hours of visitation per week.  (Id., Exh. N.)

Plaintiff argues that his confinement at MCF-OPH did cause him an atypical and significant hardship that would satisfy the Sandin standard, because (1) he was not allowed visitation privileges, (2) he was not allowed to marry his fiancé, and (3) he was not allowed to participate in Native American religious and cultural activities.  These arguments are unavailing.

First, Plaintiff acknowledges, (at least implicitly), that he was not deprived of all visitation privileges, but he was simply denied "contact visitation."  ("Plaintiff's Opposition of Summary Judgement," [Docket No. 64], p. 9.)  The Eighth Circuit Court of Appeals has explicitly held that "[a] prisoner does not have a liberty interest in contact visitation."  Phillips v. Norris, 320 F.3d 844, 847 (8th Cir.  2003).  Therefore, the Court rejects Plaintiff's contention that the absence of contact visitation is a hardship that implicates a constitutionally protected liberty interest.[4]

_____

[4] Plaintiff says that he was denied the opportunity to visit with his daughter while he was at MCF-OPH, but he has made no effort to show that she actually sought to visit him

14

Plaintiff further contends that his segregated confinement prevented him from marrying his fiancé, but the record does not support that contention. Evidently, Plaintiff simply assumed that he could not get married because he was generally precluded from contact visitation. Shortly before he was transferred to Connecticut, he tried to remove the "no contact visitation" proscription, so he could get married. (See "Declaration in Support of Response to Defendant's Second Affidavit Motion," [Docket No. 87], [hereafter "Second Crow Aff."], Attachment B.) Someone identified as "Lt. Wherley" informed Plaintiff that his request for contact visitation would be reviewed in a few weeks. (Id.) However, Plaintiff was transferred before that review occurred.

Defendants now contend that Plaintiff could have been married, despite the "no contact visitation" rule. (Defendants' Reply Brief, [Docket No. 80], pp. 3-4.) Plaintiff has not refuted this assertion. Moreover, Plaintiff's own affidavit shows that Defendant Stevenson did not bar him from getting married while he was in segregated confinement,

─────────────────────

at MCF-OPH, or that she had the means to do so. Furthermore, Plaintiff's own submissions indicate that Defendant Stevenson bore no responsibility for the "no minor visitation" policy. It appears that prison officials at MCF-SCL implemented that policy, and the policy just carried over when Plaintiff was transferred to MCF-OPH. When Plaintiff challenged the policy at MCF-OPH, other prison officials – not Stevenson – reviewed the policy, and concluded that it should remain in effect. ("Sworn Affidavit in Support of Plaintiff's Opposition of Summary Judgement," [Docket No. 66], [hereafter "Crow Aff."], Exh. E, [Docket No. 66-1], pp. 11-13].)

Plaintiff also says that he was denied the opportunity to visit with his daughter while he was still at MCF-SCL, and that he has been deprived of other visitation opportunities since he was transferred to Connecticut. However, those averments provide no support for the claim at issue here – i.e., Plaintiff's claim that Defendant Stevenson violated his right to due process while he was at MCF-OPH.

but rather, Stevenson offered a suggestion about how to pursue that objective.[5]  Thus, Plaintiff has not demonstrated that he was wholly unable to get married while he was in segregated confinement at MCF-OPH, (despite his no contact visitation status), and he certainly has not demonstrated that Defendant Stevenson prevented him from getting married.

Finally, (and perhaps most importantly), Plaintiff has offered no reason to believe that his pursuit of marriage would have unfolded any differently if he had been in the general prison population, rather than administrative segregation.  Defendants have submitted a copy of a DOC policy directive, which states that although the DOC acknowledges that prisoners have a constitutional right to marry, "the department will not encourage or assist [prisoner marriages] in any way." (Second Affidavit of Lcie Stevenson, [Docket No. 81], Exh. A., p. 1.)  This obviously suggests that no prisoner who wants to get married will get much help from prison officials, and thus the obstacles to Plaintiff's alleged marriage plans cannot be viewed as an unusual hardship that satisfies the Sandin standard.

Plaintiff next contends that his segregated confinement deprived him of a constitutionally protected liberty interest, because he was not able to practice all of his Native American cultural and religious traditions, including pipe ceremonies and smudging.[6]

---

[5]  Plaintiff avers that "I contacted defendant Lcie Stevenson, who directed me to my case worker, who then directed Lt. Wheeley and Program director Stevenson about Marriage Ceremony."  (Second Crow Aff., ¶ 4, [emphasis added].)

[6]  As described by the Eighth Circuit Court of Appeals, "[s]mudging involves the burning of plants considered sacred, such as sage, cedar, sweet grass, and tobacco or a tobacco blend called kinni-kinnick.  Prior to a Native American religious ceremony, the smoke from these burning plants is waved, using a feather, over the participants, the

Our Court of Appeals has held that "[l]imitations on religious services, especially for a short period of time, have also been found not to present an atypical and significant hardship." Phillips, 320 F.3d at 847. See also Arce v. Walker, 139 F.3d 329, 336 (2nd Cir. 1998) (deprivation of "communal religious services or communal meals" did not create conditions that were "more onerous tha[n] those considered, and constitutionally sanctioned in Sandin"); Fiorentino v. Biershbach, 64 Fed.Appx. 550, 553 (7th Cir. 2003) (unpublished opinion) ("a temporary denial of access to communal religious programs is neither an atypical nor significant deprivation warranting due process protection").

In Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997), a case that was cited with approval by the Eighth Circuit in Phillips, the Court upheld a district court order dismissing two prisoners' due process claims on summary judgment. The Court found that the prisoners had not shown that they had been deprived of a protected liberty interest while in segregated confinement for six months, even though one of the prisoners, Van Aelst, had submitted an affidavit stating that prisoners were denied all religious services. As explained by the Court –

> "Van Aelst submitted an affidavit indicating that those assigned to administrative segregation did not receive clean clothing, linen, or bedding as often as required by the regulations governing administrative segregation; that they were permitted to leave their cells three to four times per week, rather than seven, and that no outside recreation was permitted; that there were no educational or religious services available; and that food was served in considerably smaller portions. Accepting Inmates' version of the conditions in administrative segregation, as we must for purposes of review of the grant of summary judgment, we conclude that although the conditions were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months

sacred items to be used, and the area in which the ceremony will be performed." Fowler v. Crawford, 534 F.3d 931, 936, n. 7 (8th Cir. 2008), cert. denied, 129 S.Ct. 1585 (2009).

imposed a significant hardship in relation to the ordinary incidents of prison life."

Id. at 504 (emphasis added).

Based on the various appellate court decisions cited above, this Court finds that even if Plaintiff did not have the opportunity to practice certain religious and cultural activities as he has alleged, he was not deprived of a constitutionally protected liberty interest that necessitated due process.

In sum, the Court has carefully reviewed the record in this matter, and the Court has accepted Plaintiff's averments regarding the conditions of his confinement while he was in administrative segregation at MCF-OPH, while awaiting a transfer to an out-of-state prison. The Court understands that Plaintiff was removed from the general prison population for just over a year, and during that time he did not enjoy all of the privileges and amenities afforded to other Minnesota state prison inmates. For present purposes, it is accepted that Plaintiff did not have contact visitation privileges, that his daughter was not on his approved visitors list, that he was not able to get married, and that he did not get to participate in certain Native American cultural and religious activities. Nevertheless, the Court concludes, as a matter of law, that Plaintiff is unable to sustain the due process claim that he has brought against Defendant Stevenson, because he is unable to satisfy Sandin's "atypical and significant hardship" standard.[7]

---

[7] Having determined that Plaintiff was not deprived of a constitutionally protected liberty interest, the Court will not address Defendants' alternative contention – i.e., that even if Plaintiff did suffer an actionable deprivation of a liberty interest, his due process claim would still fail, because prison officials periodically reviewed his administrative segregation status, and thereby provided him a sufficient measure of due process. (Defendant's Memorandum of Law, [Docket No. 35], pp. 11-13.) See Jones v. Mabry, 723 F.2d 590, 594 (8th Cir. 1983) ("[a]s long as there is a procedure for reviewing periodically

18

B.  Equal Protection Claim Against Defendant Stevenson

Plaintiff claims that he was deprived of his constitutional right to equal protection, because Defendant Stevenson assigned him to administrative segregation based on his race.  This claim is clearly unavailing.

"The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates."  Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 984 (8th Cir.), cert. denied, 543 U.S. 991 (2004), citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir.1999).  However, a prisoner cannot sustain an equal protection claim merely by alleging that he has been treated less favorably than other inmates; he must show that his circumstances are the same as those of other inmates who purportedly received more favorable treatment.  Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("[i]n general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert denied, 534 U.S. 816 (2001), citing Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995).

If a prisoner's equal protection claim is based on alleged racial discrimination, as is the case here, then the prisoner must show that he was treated differently because of his race or religion.  Foster v. Wyrick, 823 F.2d 218, 221 (8th Cir. 1987) ("[p]roof of

---

the situations of inmates who are in administrative segregation... due process is satisfied"), cert. denied, 467 U.S. 1228 (1984); but see Williams, 277 Fed.Appx. at 649 ("for an ad seg inmate, the Constitution requires no more than the process Williams received – reviews at 60-day intervals at which Williams could make statements and present evidence, and annual meetings with a warden – provided such reviews were meaningful").  The Court has not determined how often Plaintiff's administrative segregation actually was reviewed, or whether, under the circumstances, such reviews satisfied the procedural requirements of due process.

discriminatory racial purpose is required to establish an equal protection claim"). <u>See</u> <u>also</u> <u>Buckley v. Davis</u>, No. 94-1816 (8th Cir. 1995), (<u>per</u> <u>curiam</u>), 1995 WL 115603 (unpublished opinion) at *1 (prisoner's racial discrimination claim was properly dismissed because he "did not present sufficient evidence to show any intentional discrimination by defendants").

In this case, Plaintiff has not identified any evidence that would allow a jury to conclude that Defendant Stevenson assigned him to administrative segregation because of his race. To the contrary, the record shows that Minnesota prison regulations required Stevenson to assign Plaintiff to administrative segregation while he was at MCF-OPH, because he was awaiting a transfer to an out-of-state prison. <u>See</u> Stoltz Aff., p. 3, ¶ 13; Exh. M. Thus, it clearly appears that Plaintiff's assignment to administrative segregation was precipitated by his pending prison transfer, not his race. <u>See</u> <u>Ivey v. Ashcroft</u>, No. 94-3358 (8th Cir. 1995), (<u>per</u> <u>curiam</u>), 1995 WL 486565 (unpublished opinion) at *1 (prisoners' "'race discrimination' claim" was properly dismissed on summary judgment, because "plaintiffs failed to rebut defendants' documentary evidence showing that plaintiffs were assigned to ad seg for legitimate, non-discriminatory reasons").

Plaintiff also argues that Stevenson violated his right to equal protection, because he did not grant Plaintiff the "opportunity to be heard at alleged Reviews," presumably meaning the staff-only reviews of Plaintiff's administrative segregation. ("Plaintiff's Opposition of Summary Judgement," [Docket No. 64], p. 11.) According to Defendants, however, the apposite DOC regulations do not contemplate any inmate participation in the review process. (Defendants' Reply Brief, [Docket No. 80], pp. 8-9.) Plaintiff has offered no reason to disbelieve Defendants' assertion, and the policy materials submitted by Defendants tend to support it. (Stoltz Aff., Exhs. L and M.) Furthermore, even if Plaintiff's

reviews were somehow different from those of other inmates, (and again, there is nothing in the record to support that proposition), Plaintiff has offered no reason to think that he was treated differently because of his race. See Lyon v. Farrier, 730 F.2d 525, 527 (8th Cir. 1984) ("[t]o succeed on an equal protection claim," prisoners are "required to show that they received treatment which was invidiously dissimilar to that received by other inmates"). Thus, the Court finds that Defendant Stevenson is entitled to summary judgment on Plaintiff's equal protection claim against him.[8]

### C. Due Process Claim Against Defendants Fabian, Crist and Clay

Plaintiff claims that Defendants Fabian, Crist and Clay violated his constitutional right to due process by causing him to be assigned to an out-of-state prison without affording him a hearing or any other procedural benefits. This claim must be rejected.

As discussed above, a due process claim cannot be sustained, unless the claimant can show that he was deprived of some interest warranting due process protection. (See Discussion at pp. 10-11, supra.) Therefore, Plaintiff cannot sustain his current due process claim against Defendants Fabian, Crist and Clay, unless he can show that he has a constitutionally protected liberty interest in serving his sentence in a Minnesota prison.

It is well-settled, however, that the Constitution does not give a prisoner a liberty interest in serving his sentence in any particular location. Meachum v. Fano, 427 U.S. 215,

---

[8] Much of Plaintiff's so-called equal protection argument is really just a rehashing of his due process claim. Plaintiff "challenges [the] authenticity of [the] alleged Ad-seg reviews," and contends that those reviews were procedurally inadequate because he was not given a chance to be heard. ("Plaintiff's Opposition of Summary Judgement," [Docket No. 64], p. 12.) However, the Court has already determined that Plaintiff was not entitled to due process at all, because his administrative segregation did not involve a protected liberty interest. Therefore, the adequacy and authenticity of the review process are of no legal significance here. (See n. 7, supra.)

225 (1976).  See also Montanye v. Haymes, 427 U.S. 236, 242 2547 (1976) (the Due

Process Clause "does not require hearings in connection with transfers whether or not they

are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive").

The Supreme Court has explicitly ruled that the Constitution itself does not give a prisoner

any liberty interest in serving his sentence in the state in which he is convicted.  Olim v.

Wakinekona, 461 U.S. 238, 248 (1983) ("an interstate prison transfer, ... does not deprive

an inmate of any liberty interest protected by the Due Process Clause in and of itself").

The Supreme Court has also plainly stated that "[j]ust as an inmate has no justifiable

expectation that he will be incarcerated in any particular prison within a State, he has no

justifiable expectation that he will be incarcerated in any particular State."  Id. at 245.  An

interstate prison transfer requires due process only if some state regulation protects

inmates from arbitrary transfers.  Where the state has "'impose[d] no conditions on the

discretionary power to transfer,'... there [is] no basis for invoking the protections of the Due

Process Clause."  Id. at 249, quoting Montanye, 427 U.S. at 243.

Here, Plaintiff has not identified any Minnesota regulation that limits Defendants'

discretionary authority to transfer inmates to other states pursuant to the Interstate

Corrections Compact.  Indeed, he apparently acknowledges that prison transfers are

discretionary decisions under Minnesota law.  (See "Plaintiff's Opposition of Summary

Judgement," [Docket No. 64], p. 21.)  It appears that here, as in Olim and Meachum,

Minnesota prison officials "may transfer a prisoner 'for any reason or for no reason at all.'"

Olim, 461 U.S. at 250, quoting Meachum, 427 U.S. at 228.  Thus, the Court concludes that

Defendants' decision to transfer Plaintiff to a prison in Connecticut did not deprive him of

any protected liberty interest warranting the protections of due process.  See Olim, 461

U.S. at 249 (if "prison regulations place no substantive limitations on official discretion," then they "create no liberty interest entitled to protection under the Due Process Clause").

Plaintiff argues that Defendants deprived him of a protected liberty interest, by transferring him to Connecticut, because he has not enjoyed the same privileges in the Connecticut prison as he supposedly would have if he had stayed in Minnesota. ("Plaintiff's Opposition of Summary Judgement," [Docket No. 64], pp. 18, 22.) He contends that he would enjoy greater opportunities for Native American religious and cultural activities if he were still incarcerated in Minnesota. (Id.) That might be so, but even if Plaintiff is enduring much harsher conditions in Connecticut, he still has no liberty interest that limits Defendants' choice for his prison placement. "That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." Meachum, 427 U.S. at 225.

If Plaintiff's constitutional rights have been violated since his arrival in Connecticut, (as he insinuates), then he might be able to seek relief for those specific violations against the individual Connecticut state employee(s) who proximately caused them. However, Plaintiff cannot establish that he has a constitutionally protected liberty interest in remaining in a Minnesota prison, simply by alleging that his constitutional rights were violated after he was transferred to a prison in another state.

Plaintiff seems to believe that if a prison official transfers an inmate to a different institution, that official becomes strictly liable for any injury the inmate might suffer in the new institution. Plaintiff has cited no legal authority to support this radical proposition, and this Court will not be the first to adopt it. Thus, the Court rejects Plaintiff's contention that

the moving Defendants deprived him of a protected liberty interest by transferring him to Connecticut, merely because his constitutional rights allegedly have been infringed since he began serving his sentence there.

Again, the Supreme Court has made it abundantly clear in <u>Meachum</u>, <u>Montanye</u>, and <u>Olim</u> that prisoners do not normally have any constitutionally protected liberty interest in being confined in any particular institution, or in any particular state. Plaintiff has not identified any Minnesota regulation that limited Defendants' discretion to transfer him to another state pursuant to the Interstate Corrections Compact. Thus, the Court concludes that Plaintiff does not have a protected liberty interest in remaining in Minnesota, and Defendants were free to transfer him to Connecticut, and keep him there, without affording him any procedural due process.

    D. <u>Equal Protection Claim Against Defendants Fabian, Crist and Clay</u>

Plaintiff also claims that Defendants Fabian, Crist and Clay violated his constitutional right to equal protection by transferring him to Connecticut. It appears that Plaintiff's equal protection claim is <u>not</u> based on a contention that he was transferred because of his race.[9] Instead, Plaintiff seems to be claiming that he was arbitrarily singled out from other prisoners, and that Defendants transferred him without any justification.

---

[9] Defendants have explicitly asserted that "Plaintiff is not alleging that his transfer to Connecticut was based on race," (Defendants' Reply Brief, [Docket No. 80], p. 12), and Plaintiff has not contradicted that assertion. Furthermore, Plaintiff has contended that other Native American inmates have not been transferred out of state. ("Plaintiff Oppossition [sic] to reply Brief Motion to Summary Judgement," [Docket No. 90], p.10.) As Defendants have correctly pointed out, Plaintiff's assertion that other Native American inmates have not been transferred out of state would effectively foreclose any argument that his own transfer to Connecticut was racially motivated. (<u>Id</u>., n. 6.)

"To succeed on an equal protection claim" in a prison context, a prisoner "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest." Murphy, 372 F.3d at 984.

> "The heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest.... [Citation omitted.] The Supreme Court has explained that 'if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.'"

Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998), quoting Romer v. Evans, 517 U.S. 620, 631 (1996). See also Wishon v. Gammon, 978 F.2d 446, 450 (8th Cir. 1992) ("[t]o prove an equal protection violation," a prison inmate must "show that he was treated differently from similarly situated inmates... and that there was no rational basis related to a legitimate state purpose for the unequal treatment").

Our Court of Appeals has said that –

> "[E]ven where similarly situated persons are treated differently by the state, state action is presumed constitutional and 'will not be set aside if any state of facts reasonably may be conceived to justify it.' McGowan v. Maryland, 366 U.S. 420, 426... (1961). We will uphold a challenged state action so long as it bears a rational relationship to a state objective not prohibited by the Constitution."

More v. Farrier, 984 F.2d 269, 271 (8th Cir.), cert. denied, 510 U.S. 819 (1993).

In this case, it is by no means clear that Plaintiff was treated differently from other "similarly situated" inmates. Defendants have presented a strong argument that "Plaintiff has not been able to identify a similarly situated individual who was treated differently."

(Defendants' Reply Brief, [Docket No. 80], p. 13.)[10] However, as Defendants further argue, it is even more clear that even if Plaintiff was somehow treated differently from some other "similarly situated" inmates, it cannot be said that "this difference in treatment bears no rational relation to any legitimate penal interest." Weiler, supra.

Defendants have produced very compelling evidence to support their contention that there was a "rationale basis" for transferring Plaintiff to a different state, and that Plaintiff's transfer served a perfectly "legitimate penal interest." According to Defendants, Plaintiff was transferred for security reasons, and the record clearly substantiates that assertion.

Plaintiff compiled an abysmal disciplinary record during his short stay at MCF-SCL. Just days after Plaintiff was sentenced, he got into a fight and was sent to segregated confinement. While in segregated confinement, he threatened another inmate, which earned him an extended stay there.[11] The very day that Plaintiff was released from segregated confinement, he got into another fight. Based on this record alone, Defendants had ample reason to view Plaintiff as a security problem. They obviously had good reason to be concerned about his safety, and the safety of others.

---

[10] If Plaintiff believes that all prisoners of the State of Minnesota must be treated the same, regardless of where they are confined, that notion must be rejected. See Stewart v. McManus, 924 F.2d 138, 142 (8th Cir. 1991) (Kansas prisoner confined in Iowa could not sustain equal protection claim by arguing that "all Kansas inmates must be treated similarly, whether they are in physical custody of Kansas or Iowa").

[11] Plaintiff contends that summary judgment is precluded, because there is a question of fact about whether he actually intended to threaten another inmate. For present purposes, however, Plaintiff's subjective intent is irrelevant. The evidence shows that prison officials had good reason to believe that Plaintiff was threatening another inmate, and that reasonable belief, (whether factually correct or not), lends further support to their argument that Plaintiff was transferred because of legitimate security concerns.

Furthermore, it appears that Plaintiff had already accumulated a prodigious disciplinary record before he even began to serve his current life sentence. Plaintiff's DOC "Disciplinary History Report" shows that he was charged with violating prison rules on more than a dozen occasions between November 2000 and May 2004. (Stoltz Aff., Exh. A.) On most of those occasions he was found guilty of an infraction and was punished. (Id.) Plaintiff's prior disciplinary record provides further support for Defendants' contention that Plaintiff presented security concerns that warranted an out-of-state transfer.

The Court concludes that Plaintiff cannot sustain his equal protection claim against Defendants Fabian, Crist and Clay, because he cannot show that those Defendants arbitrarily treated him differently from other inmates by transferring him to a prison outside of Minnesota. There were good and sufficient reasons to consider Plaintiff to be a security problem, which gave Defendants ample and legitimate cause to select him for an out-of-state prison transfer. Therefore, Defendants Fabian, Crist and Clay are entitled to summary judgment on Plaintiff's equal protection claim against them. See Williams, 277 Fed.Appx. at 650 (defendants entitled to summary judgment on prisoner's equal protection claim where prisoner was unable to show that other inmates "were treated differently, despite being similarly situated, in a manner that bore no rational relation to any legitimate penological interest"); Phillips, 320 F.3d at 848 (prisoner's equal protection claim was properly dismissed on summary judgment where prisoner could not prove "disparate treatment, the absence of a rational relationship to any legitimate penal interest, or intentional discrimination").

F. "Access to the Courts" Claim

Finally, Plaintiff claims that Defendants have violated his constitutional rights by

depriving him of access to the courts.  Plaintiff specifically contends that he was not given sufficient access to law books and other legal materials after he was transferred to Connecticut.  He purportedly needed greater access to legal resources, so he could properly present his state and federal post-conviction challenges to his murder conviction and life sentence.[12]

In <u>Bounds v. Smith</u>, 430 U.S. 817 (1977), the Supreme Court recognized that prisoners retain a limited constitutional right of access to the courts.  According to <u>Bounds</u>, prisoners must have access to basic legal research materials or a legal assistance program, so they can pursue legal recourse in the courts.  <u>Id</u>.; <u>Myers v. Hundley</u>, 101 F.3d 542, 544 (8th Cir. 1996).  However, a prison inmate has no "abstract, freestanding right" of access to legal resources.  <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996).  "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim."  <u>White v. Kautzky</u>, 494 F.3d 677, 680 (8th Cir. 2007).

In <u>Lewis</u>, the Supreme Court held that a prisoner lacks standing to bring an access to the courts claim, unless he can show some "actual injury."  518 U.S. at 349.  <u>See</u> <u>also</u>

---

[12]  Plaintiff does not appear to be claiming that he was denied access to the courts while he was still confined at MCF-OPH, and, in any event, the record shows that he would have no viable grounds for making such a claim.  Plaintiff contends that he needed greater access to legal materials to facilitate state and federal post-conviction proceedings.  However, the potential usefulness of post-conviction remedies did not arise until after Plaintiff's conviction was affirmed on direct appeal, and that did not occur until <u>after</u> he was already in Connecticut.  Therefore, Plaintiff's denial of access to the courts claim could not have arisen while he was still in Minnesota.

Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) ("[i]n Lewis v. Casey, the Supreme Court held, based on principles of standing, that actual injury must be proven in order to prevail on an access-to-courts claim"). Thus, an inmate cannot prosecute an access to the courts claim unless he can show that he has been deprived of some specific opportunity to advance a viable legal challenge to his conviction or the conditions of his confinement, in some particular action. Lewis, 518 U.S. at 351; Sabers v. Delano, 100 F.3d 82, 84 (8th Cir. 1996) (per curiam). The inmate must identify some specific injury resulting from the alleged lost opportunity to litigate. Speculative injuries – i.e., injuries that might occur, or could have occurred – are not sufficient. See Hartsfield v. Nichols, 511 F.3d 826, 833 (8th Cir. 2008) ("[a]bsent an articulation of how the alleged wrongful conduct actually blocked [the prisoner's] access to filing a complaint, or caused a filed complaint to be deficient, [the prisoner's] alleged injuries are merely speculative").

A prisoner who claims that he has been denied his constitutional right of access to the courts must show that he suffered some specific harm to a particular legal right, which is directly attributable to inadequate access to legal resources. "[I]n order to establish a claim of constitutional dimensions, an inmate must come forward with something more than vague and conclusory allegations of harm. He must establish some specific prejudice...." Bannan v. Angelone, 962 F.Supp. 71, 74 (W.D.Va. 1996). "Plaintiffs must demonstrate, for example, that the inadequacy" of access to legal resources "caused such actual injury as the late filing of a court document or the dismissal of an otherwise meritorious claim." Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir. 1996) (emphasis added). Thus, to survive summary judgment on a claim for denial of access to the courts, a prisoner must present some specific evidence that will satisfy the "actual injury" requirement of Lewis v. Casey.

Vague and conclusory allegations will not suffice; the inmate must show some specific actual injury in some specific court action.

Here, Plaintiff's claim for denial of access to the courts cannot survive Defendants' summary judgment motion for two reasons.

First, Plaintiff has cited no evidence that would allow a jury to conclude that any of the moving Defendants, (Stevenson, Fabian, Crist, and Clay), prevented him from obtaining any legal materials that he allegedly needed to pursue his post-conviction remedies. As noted above, (see fn. 12, supra), Plaintiff's direct appeal was not completed, and thus his post-conviction remedies did not become ripe, until after he had been transferred to Connecticut. Plaintiff has not shown that any of the moving Defendants, all of whom are employees of the Minnesota DOC, had any legal responsibility to provide legal resources to Plaintiff during his imprisonment in another state. If anyone prevented Plaintiff from having access to legal resources during his confinement in Connecticut, that presumably would have been someone affiliated with the Connecticut prison where he has been residing.

Plaintiff seems to believe that the moving Defendants deprived him of legal resources, simply because they allegedly transferred him to Connecticut, and did not grant his requests to be transferred back to Minnesota. This argument assumes that the moving Defendants should be held strictly liable for any injury that Plaintiff might sustain during his confinement in Connecticut, simply because they (allegedly) transferred him there. The Court has already rejected this proposition, because Plaintiff has cited no legal authority to support it. (See Discussion at pp. 23-24, supra.) Because Plaintiff is unable to show that any of the Minnesota DOC Defendants caused him to be deprived of any legal

30

materials that he purportedly needed while in Connecticut, those Defendants are entitled to summary judgment on Plaintiff's claim of denial of access to the courts.

More importantly, however, even if Plaintiff could show that the moving Defendants were responsible for depriving him of the legal resources he purportedly needed, his denial of access to the courts claim still would fail, because he is unable to show any specific occasion when he actually lost a substantive legal right as a direct result of the alleged restrictions on his access to legal resources. Plaintiff has not demonstrated that he has actually lost any sustainable claim or defense, in a pending or contemplated court proceeding pertaining to his conviction or the conditions of his confinement, which would have been preserved if he had been provided access to some particular legal resource. In short, Plaintiff is unable to satisfy <u>Lewis</u>'s "actual injury" requirement.

Plaintiff <u>claims</u> that he was not able to pursue post-conviction relief, because he did not have access to legal resources, but Defendants have presented ample evidence to disprove that claim. The record shows that Plaintiff committed a common error when he began his quest for post-conviction relief, because he filed a federal habeas corpus petition that included claims that had not yet been fairly presented to, and adjudicated by, the Minnesota Supreme Court. Because Plaintiff had failed to exhaust his state court remedies for all of his claims, (as required by 28 U.S.C. § 2254(b), and <u>Rose v. Lundy</u>, 455 U.S. 509 (1982)), Plaintiff's habeas corpus petition was summarily dismissed, <u>without prejudice</u>. (<u>Crow v. Hatch</u>, Civil No. 08-1039 (PJS/FLN).) The District Judge's order that dismissed Plaintiff's habeas petition specifically informed him that he would need to file a state post-conviction motion in order to satisfy the exhaustion requirement for the unexhausted claims included in his petition. That order also informed Plaintiff that federal habeas proceedings

are subject to a one-year statute of limitations, (see 28 U.S.C. § 2244(d)), but if he acted promptly, he should be able to pursue his state post-conviction remedies, and still have time to seek further federal habeas relief, (in a new action), if the state courts did not grant post-conviction relief.[13]

After Plaintiff's habeas petition was denied (without prejudice), he did file a timely post-conviction petition in the state trial court. (Evans Aff., Exh. C.) That petition was accepted by the trial court, and the claims presented therein were considered and addressed by the trial court. The trial court also considered and rejected Plaintiff's motion for reconsideration. Plaintiff then filed a second post-conviction petition, in which he contended that he had been deprived of his constitutional rights in connection with his first such petition. The trial court judge rejected that argument, ruling that Plaintiff's substantive post-conviction claims had been rejected because they lacked merit, and not because of any shortcoming that could have been overcome by having greater access to legal resources. The trial judge's explication of his ruling bears repeating here:

> "Petitioner's current contention that he was denied meaningful access to the courts regarding his first Petition is clearly an argumentative assertion without factual support. Petitioner's efforts in pursuing his legal claim were not hindered by shortcomings in a law library. The Petition was not dismissed for failure to satisfy a technical requirement, of which he could not know because of deficiencies in legal assistance facilities. Indeed, Petitioner's filings contained a variety of relevant case citations and analysis. Rather, the first Petition was denied because, after thorough examination of the merits, this Court concluded that the files and records conclusively demonstrated that Petitioner was not entitled to relief. To state the point another way, Petitioner's allegations of the first Petition would have failed even if he had full access to a Minnesota law library with legal assistance. Such access would not have changed the merits of Petitioner's ineffective

---

[13] A copy of the District Judge's order in Plaintiff's prior habeas case is included in the present record. (Evans Aff., Exh. B.)

assistance of counsel claims. Nor would such access have changed the fact that Petitioner's prosecutorial misconduct claims were procedurally barred or completely lacked factual support."

(Evans Aff., Exh. F, pp. 7-8; [emphasis added].)

Given the trial judge's ruling on Plaintiff's second post-conviction petition, this Court now finds, as a matter of law, that Plaintiff cannot show that he was prevented from presenting his post-conviction claims because he lacked sufficient access to legal resources. Therefore, Plaintiff cannot satisfy the "actual injury" requirement prescribed by Lewis. For this additional reason, (and for this reason by itself), the moving Defendants are entitled to summary judgment on Plaintiff's claim of denial of access to the courts.[14]

---

[14] There are two further matters pertaining to Plaintiff's access to the courts claim that warrant brief mention. First, Defendants have presented evidence showing that Minnesota prisoners can obtain legal materials from the Minnesota State Law Library, through a program identified as "Law Library Services to Prisoners," or "LLSP." (Affidavit of Daniel Lunde, [Docket No. 36], p. 1, ¶ 3.) This program is available to prisoners confined in other states. (Id.) The evidence shows that Plaintiff sought and obtained assistance from LLSP on numerous occasions between August 14, 2008, and July 24, 2009, and that Plaintiff received over 400 pages of legal materials during that time period. (Id., pp. 3-4, ¶s 8-11.) While this evidence certainly undermines Plaintiff's access to the courts claim, it is not deemed to be dispositive, because it is unclear whether Plaintiff had access to LLSP while he was preparing his first state post-conviction petition. Defendants' evidence suggests that Plaintiff may not have had access to LLSP before August 14, 2008, by which time he had already filed his first state post-conviction petition.

Second, the Court has not overlooked Plaintiff's contention that he has been deprived of access to the courts because he has been unable to defend himself against a civil wrongful death action that has been brought against him in a Minnesota state court. This contention is entitled to no weight, for at least three elemental reasons: (1) it is not alleged in Plaintiff's complaint, (see Discussion at pp. 34-35, infra); (2) it does not pertain to Plaintiff's conviction, or the conditions of his confinement, (see Lewis, 518 U.S. at 355); and (3) the state court judge presiding over the wrongful death case has already determined that Plaintiff had access to the courts, by means of an attorney who represented him in that case, until Plaintiff fired him, (see Crow Aff., Exh. D, [Docket No. 66-1, pp. 132-38]).

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has filed a motion seeking summary judgment on two claims.[15]  First, Plaintiff claims that he has been deprived of his First Amendment right of "freedom of religion," because prison officials in Connecticut will not allow him to possess eagle feathers, which allegedly are a critical component of his Native American religious beliefs. Second, Plaintiff claims that he has been deprived of his constitutional right of access to the courts, because he has been unable to defend himself against a civil wrongful death action that is currently pending against him in a Minnesota state district court.  Plaintiff has filed sundry documentary evidence in support of both of these claims.  (Docket No. 66-1, pp. 95-96, 104-38; Docket No. 89, Docket No. 95, and Docket No. 97.)

Defendants contend that Plaintiff's summary judgment motion must be denied because (a) it is untimely, and (b) it seeks judgment on claims that have not been pled. (Defendants' Reply Brief, [Docket No. 80], pp. 1, 17.)  Both of these arguments are valid.

On December 9, 2008, the Court entered a pretrial order in this case, (Docket No. 16), which expressly stated that dispositive motions must be filed and served prior to August 1, 2009.  Plaintiff's summary judgment motion was not filed until September 16, 2009, which was long after the deadline for filing such motions.  For this reason alone, Plaintiff's summary judgment motion is properly deniable.

More importantly, however, neither of the two claims presented in Plaintiff's summary judgment motion is mentioned, or even alluded to, in his complaint.  The Eighth

---

[15]  As previously noted, (see fn. 2, supra), Plaintiff's summary judgment motion has been filed as part of his opposition to Defendants' motion for summary judgment.  (Docket No. 66-1, pp. 97-103.)

Circuit has held that parties cannot "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." Northern States Power Co. v. Federal Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004). See also Rodgers v. City of Des Moines, 435 F.3d 904, 910 (8th Cir. 2006) ("district court properly refused to consider unpled allegations" advanced in opposition to summary judgment motion); Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment"); Clemons v. City of Minneapolis, Civil No. 05-2165 (RHK/AJB) (D.Minn. 2007), 2007 WL 1202331 at 6, n. 16 (First Amendment claim that "is nowhere mentioned" in Plaintiff's complaint would not be considered on summary judgment).

If a party cannot raise a new, previously unpled, claim in opposition to another party's summary judgment motion, then a party certainly cannot seek summary judgment for himself on a new claim that has not been pled in his complaint. See Gilmour, 382 F.3d 1312 at 1314 ("liberal pleading standard for civil complaints... does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage"). Because neither of the claims advanced in Plaintiff's summary judgment motion have been pled in his complaint, Plaintiff's motion must be denied.

## V.  PLAINTIFF'S CLAIMS AGAINST DEFENDANT MILLING

Because Plaintiff has filed his own summary judgment motion, the Court finds that it is proper to consider, sua sponte, whether any of his claims require a trial, or whether this entire action can properly be decided on summary judgment. More specifically, the Court finds it proper to consider whether, given Plaintiff's motion for summary judgment against all Defendants, this action can be dismissed as to all Defendants – including the one

Defendant who has not moved for summary judgment, Defendant Lynn Milling.

"The weight of the authority... is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil, § 2720 (3rd ed. 1998). In other words, "the practice of allowing summary judgment to be entered for the nonmoving party in the absence of a formal cross-motion is appropriate." Id. See also Sentara Virginia Beach Gen. Hosp. v. LeBeau, 188 F.Supp.2d 623, 626 (E.D.Va. 2002) ("summary judgment may be rendered in favor of the nonmoving party, even though that party has made no formal motion under Federal Rule of Civil Procedure 56") (citing Celotex Corp., 477 U.S. at 326).

In this case, the Court finds that it is entirely appropriate to enter summary judgment against Plaintiff on his claims against Defendant Milling, even though Milling has not filed a formal Rule 56 cross-motion in response to Plaintiff's summary judgment motion.

Plaintiff's complaint identifies Defendant Milling as "the Deputy Warden to the Interstate Compact Office of the Connecticut DOC, whose address is 1153 East Street South, Suffield, Connecticut, 06080." (Complaint, p. 5, Attachment B.)[16] There is nothing in Plaintiff's complaint, or in the evidentiary record, which suggests that Defendant Milling played any role in the decision to transfer Plaintiff out of Minnesota, or assign him to

---

[16] Defendant Milling's answer to the complaint indicates that she denies "the phrase 'who is employed as the Deputy Warden to the Interstate Compact Office of the Connecticut DOC,' which is... incomplete and/or inaccurate." (Answer of Lynn Milling, [Docket No. 61], p. 1, ¶ 6.) However, the record includes a letter purportedly signed by Defendant Milling, which identifies her as "Deputy Warden, Interstate Compact Office." (Docket No. 66-1, p. 41.) For present purposes, the Court accepts Plaintiff's identification of Defendant Milling, and, in any event, it clearly appears that she is a prison official who is employed, in some capacity, by the corrections department of the State of Connecticut.

segregated confinement at MCF-OPH. Therefore, Plaintiff obviously cannot be suing Defendant Milling on any of his first four claims for relief, (i.e., that he was removed from the general Minnesota prison population, and kept in segregated confinement at MCF-OPH, in violation of his right to due process and his right to equal protection, and that he was transferred to Connecticut in violation of his right to due process, and his right to equal protection). The only conceivable claim that Plaintiff could be attempting to bring against Defendant Milling is his denial of access to the courts claim.

However, Plaintiff cannot sustain his access to the courts claim against Defendant Milling, for the same reason that he cannot sustain that claim against any of the other Defendants. As discussed above, Plaintiff's access to the courts claim must be dismissed, because he cannot satisfy the Lewis actual injury requirement. (See Discussion at pp. 31-33, supra.) More specifically, Plaintiff cannot show that he lost any substantive legal right, pertaining to his conviction or the conditions of his confinement, because he was deprived of adequate legal resources or adequate means of presenting his claims to the courts. Plaintiff's post-conviction claims were denied for lack of merit, and not for lack of access to the courts. (Id.) Thus, the Court concludes that Plaintiff's access to the courts claim must be dismissed in its entirety – not only as it pertains to the moving Defendants, (Fabian, Crist, Clay and Stevenson), but also as it pertains to Defendant Milling. Because the only claim that Plaintiff has brought against Defendant Milling, (i.e., the access to the courts claim), is unsustainable, the Court will recommend that Milling be granted summary judgment, even though she has not filed a motion under Rule 56.

## VI. CONCLUSION

The Court's conclusions in this matter can be summarized as follows: First, Plaintiff cannot sustain his due process claim against Defendant Stevenson, because he cannot show that he had a protected liberty interest in remaining in the general prison population at MCF-OPH. He also cannot sustain his equal protection claim against Defendant Stevenson, because he cannot show that he was assigned to administrative segregation by reason of his race. Plaintiff's due process claim against the other moving Defendants, (Fabian, Crist and Clay), is unsustainable, because he has no protected liberty interest in being imprisoned only in the State of Minnesota; and Plaintiff cannot sustain his equal protection claim against those Defendants, because he cannot show that he was treated differently from other similarly situated inmates, without a rational reason for doing so. Finally, Plaintiff cannot sustain his denial of access to the courts claim against <u>any</u> of the Defendants, because he cannot satisfy the actual injury requirement.[17]

Plaintiff's own summary judgment motion must be denied. He cannot be granted judgment on the claims presented in his motion, because those claims have not been pled.

Thus, the Court will recommend that Defendants' motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied. Because Plaintiff cannot sustain his only claim against Defendant Milling, (i.e., his access to the courts claim), the Court will recommend that she should also be granted summary judgment. In sum, the Court will recommend that this case be dismissed in it's entirety, and with prejudice.

---

[17] Because the Court has determined that Plaintiff cannot sustain any of his claims against any of the Defendants, their qualified immunity defenses will not be addressed.

## VII.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

IT IS HEREBY RECOMMENDED that:

1. Defendants' Motion For Summary Judgment, (Docket No. 34), be GRANTED;

2.  Plaintiff's Motion For Summary Judgment, (Docket No. 66-1, pp. 97-103), be DENIED;

3.  Summary Judgment be GRANTED in favor of Defendant Lynn Milling; and

4.  This action be dismissed with prejudice.

Dated: February __4_, 2010

s/ *Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 18, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.